# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND, ET AL., | |
| **Plaintiffs,** | |
| **v.** | Civil No. 24-0096-BAH |
| GORDON SIGN COMPANY, LLC, | |
| **Defendant.** | |

## MEMORANDUM OPINION

The International Painters and Allied Trades Industry Pension Fund (the "Fund"), along with Daniel R. Williams acting as the Fund's fiduciary (collectively, "Plaintiffs"), filed this lawsuit against Gordon Sign Company, LLC, ("Defendant" or "Gordon Sign") to collect withdrawal liability and additional damages for Gordon Sign's alleged violations of the Employee Retirement Income Security Act ("ERISA") of 1974, as amended, 29 U.S.C. § 1001 et seq. *See* ECF 1 ("Complaint"). Pending before the Court is Plaintiffs' Motion for Default Judgment (the "Motion."). ECF 13. Defendant did not file an opposition. All relevant filings include memoranda of law and exhibits.[1] The Court has reviewed these filings and finds that no hearing is necessary. *See* L.R. 105.6. Accordingly, for the reasons stated below, Plaintiffs' Motion will be **GRANTED in part** and **DENIED in part.**

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

## I.   BACKGROUND

### A. Factual Background

The Fund operates as a multiemployer benefit plan and is headquartered in Hanover, Maryland. ECF 1, at ¶ 4. And, like any pension fund, the Fund provides retirement benefits to eligible participants. *Id.* ¶ 5. Daniel Williams is a Fund fiduciary specializing in the collection of contributions and withdrawal liability. *Id.* ¶ 6. Gordon Sign is incorporated and headquartered in Colorado. *Id.* ¶ 7.

Under collective bargaining agreements that Gordon Sign entered into, Gordon Sign had to contribute to the Fund for certain work its employees performed. *Id.* ¶¶ 8–9.

At some point, the Fund "determined that Gordon Sign completely withdrew from the Fund . . . during the 2018 plan year." *Id.* ¶ 10; *see* ECF 1-1, at 3 (listing Gordon Sign's withdrawal date as December 31, 2018). So, on November 10, 2022, the Fund sent a Withdrawal Liability Notice and Demand letter to Gordon Sign, *see* ECF 1-1 ("Demand Letter"). ECF 1, at ¶ 11. The Demand Letter explained Gordon Sign's complete withdrawal in 2018, set the liability at $254,497, and offered payment options: pay in full or with 94 monthly payments of $3,411 and a final payment of $1,445. *Id.* ¶ 12. "The first payment . . . was due within 60 days from receipt of the Demand Letter (*i.e.*, on or before January 10, 2023)." *Id.*

Gordon Sign did not pay by the Demand Letter's deadline. *Id.* ¶ 13. So, on January 16, 2023, the Fund issued a 60-Day Cure Notice to Gordon Sign. *Id.* ¶ 14. The notice warned that if Gordon Sign did not cure its delinquency in 60 days, that is, by March 17, the Fund would sue to collect the balance in a lump sum and "damages available under the Fund's withdrawal liability rules and 29 U.S.C. § 1132(g)(2)," namely interest, liquidated damages, attorneys' fees, and costs. *See id.* ¶ 15.

Yet Gordon Sign still did nothing. *See id.* ¶ 16. And in doing nothing, it waived any possible challenges to the Fund's assessment, at least according to the Complaint. *Id.* ¶ 17.

Gordon Sign did not cure its delinquency by the March 17 deadline; indeed, it still hasn't. *Id.* ¶ 18.

### B. Procedural Background

To enforce its alleged right to repayment, the Fund sued Gordon Sign on January 11, 2024. ECF 1. About a month later, on February 12, the Fund served the summons on Gordon Sign. ECF 8. Gordon Sign had through March 4 to answer the Complaint. *Id.* It did not, so on March 12, the Clerk entered an order of default against it. ECF 10. Two months later, on May 15, 2024, the Fund moved for a default judgment. ECF 13. Gordon Sign never responded. The motion is ripe for review.

## II.   **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." The Court may conduct hearings or make referrals when necessary to determine the damages, establish the truth of any allegation by evidence, or investigate any other matter. Fed. R. Civ. P. 55(b)(2). Thereafter, the Court may enter default judgment at the plaintiff's request and with notice to the defaulting party. *Id.*

Although the United States Court of Appeals for the Fourth Circuit has announced a "strong policy" in favor of deciding cases on their merits, *United States v. Schaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993), default judgment may be appropriate when a party is unresponsive.

*S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).

A plaintiff, however, is not automatically entitled to default judgment simply because the defendant has not responded. Rather, entry of default judgment is left to the sound discretion of the Court. *See, e.g., Choice Hotels Int'l, Inc. v. Jai Shree Navdurga, LLC*, Civ. No. DKC-11-2893, 2012 WL 5995248, at *1 (D. Md. Nov. 29, 2012); *see also Choice Hotels Int'l, Inc. v. Austin Area Hospitality, Inc.*, Civ. No. TDC-15-0516, 2015 WL 6123523, at *1 (D. Md. Oct. 14, 2015).

With respect to liability, the Court takes as true all well-pleaded facts in the complaint. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). The Court applies the pleading standards announced in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) in the context of default judgments. *See, e.g., Balt. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 544 (D. Md. 2011). A complaint that avers bare legal conclusions or "naked assertion[s] devoid of further factual enhancement," is insufficient to award default judgment. *Id.* ("The record lacks any specific allegations of fact that 'show' why those conclusions are warranted.") (internal quotation omitted). The Court "must, therefore, determine whether the well-pleaded allegations in [the] complaint support the relief sought." *Ryan*, 253 F.3d at 780. "The party moving for default judgment has the burden to show that the defaulted party was properly served and that the unchallenged factual allegations constitute a legitimate cause of action." *Harris v. Blue Ridge Health Servs., Inc.*, 388 F. Supp. 3d 633, 638 (M.D.N.C. 2019) (cleaned up).

If the complaint avers sufficient facts from which the Court may find liability, the Court next turns to damages. *See Ryan*, 253 F.3d at 780–81. The Court must make an independent

4

determination regarding damages and cannot accept as true factual allegations of damages. *See*
*Lawbaugh*, 359 F. Supp. 2d at 422. Damages are restricted to that which is requested in the
complaint. *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed
in amount, what is demanded in the pleadings."). While the Court may conduct an evidentiary
hearing to determine damages, it is not required to do so; it may rely instead on affidavits or
documentary evidence in the record to determine the appropriate sum. *See Monge v. Portofino*
*Ristorante*, 751 F. Supp. 2d 789, 795 (D. Md. 2010) (collecting cases).

## III.  ANALYSIS

Plaintiffs seek a default judgment against Gordon Sign. ECF 13. Before addressing
(A) whether Gordon Sign is liable and (B) if so, what damages it is liable for, two threshold
matters: First, the Court finds that Defendants were properly served and failed to file a responsive
pleading. *See* ECF 8. Second, the Court finds that it has subject matter jurisdiction over this action
pursuant to 29 U.S.C. § 1132(e)(1). As such, the Court moves to (A) Gordon Sign's liability.

### A.  Gordon Sign's Withdrawal Liability

ERISA was enacted to promote and protect "'the interests of employees and their
beneficiaries' by establishing 'minimum standards ... assuring the equitable character of
[employee benefit] plans and their financial soundness.'" *Trustees of the Plumbers & Pipefitters*
*Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 440 (4th Cir. 2015) (quoting 29 U.S.C.
§ 1001(a)). "Multiemployer pension plans, structured in accordance with ERISA, provide for the
pooling of contributions and liabilities." *Penske Logistics LLC v. Freight Drivers & Helpers Loc.*
*Union No. 557 Pension Fund*, 820 F. App'x 179, 181 (4th Cir. 2020).

In order to "shore up the financial stability of multiemployer pension plans," *Bd. of Trs.,*
*Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 374 (4th Cir. 2006),

"Congress in 1980 passed the Multiemployer Pension Plan Amendments Act (the 'MPPAA')[,]" which "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan[,]" *Plumbing Servs.*, 791 F.3d at 440 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984)). "An employer owes withdrawal liability when it makes a complete or partial withdrawal from a pension plan." *Id.* (citing 29 U.S.C. § 1381(a)). "An employer's complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan[.]" *Penske Logistics*, 820 F. App'x at 182 (citing 29 U.S.C. § 1383(a)). "When an employer withdraws from a multiemployer plan, the "plan sponsor"—the designated administrator of the plan—is required to (1) determine the amount of the employer's withdrawal liability, (2) notify the employer of the amount of the withdrawal liability and schedule of liability payments, and (3) demand and collect the amount of the withdrawal liability from the employer in accordance with the schedule." *Int'l Painters & Allied Trades Indus. Fund v. Interiors by Steve, Inc.*, Civ. No. JRR-21-229, 2023 WL 4446572, at *3 (D. Md. July 11, 2023) (Maddox, J.,) (citing 29 U.S.C. §§ 1382, 1399(b)(1)), *report and recommendation adopted sub nom. Int'l Painters & Allied Trades Indus. Pension Fund v. Interiors by Steve, Inc.*, No. 1:21-CV-229-JRR, 2023 WL 6973583 (D. Md. Aug. 17, 2023).

A "default" occurs when the employer fails to make withdrawal liability payments when due and "the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure[.]" 29 U.S.C. § 1399(c)(5)(A). "In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." *Id.*

6

An employer disputing the plan sponsor's assessment of withdrawal liability is permitted to submit an objection to the plan sponsor or can request that the plan sponsor review any specific matter relating to its determination of the employer's liability and schedule of payments. 29 U.S.C. § 1399(b)(2)(A); *see also Plumbing Servs.*, 791 F.3d at 441. "An employer dissatisfied with the plan sponsor's response must demand arbitration within a 60-day period after the earlier of the date of the plan sponsor's notification that it has rejected the employer's request for review, or 120 days after the employer's request for review." *Plumbing Servs.*, 791 F.3d at 441 (citing 29 U.S.C. § 1401(a)(1)). "If . . . the employer does not pursue arbitration, the amount assessed by the plan sponsor as withdrawal liability 'shall be due and owing on the schedule set forth by the plan sponsor,' which may then 'bring an action in a State or Federal court of competent jurisdiction for collection.'" *Id.* (quoting 29 U.S.C. § 1401(b)(1)). "In such a circumstance, an employer is deemed to have waived review of all issues concerning the determination of withdrawal liability." *Id.* (citing *BES Servs.*, 469 F.3d at 375).

Plaintiffs' allegations in the complaint support the relief sought in this action. As alleged in the complaint and corroborated by its exhibits, Gordon Sign was required by the terms of collective bargaining agreements to contribute to the Fund, a multiemployer plan. ECF 1, at ¶¶ 8–9. Gordon Sign stopped doing so on December 31, 2018. *Id.* ¶¶ 10, 12; ECF 1-1, at 3. In accordance with 29 U.S.C. § 1382, the Fund determined the amount of Gordon Sign's withdrawal liability, notified it of that amount in its November 2022 Demand Letter, *see* ECF 1-1. ECF 1, at ¶ 11–13. And, as fiduciary for the Fund, Plaintiff Williams is responsible for collecting that amount. *See id.* ¶ 6.

Gordon Sign never paid its withdrawal liability, nor did it ever request a review of or arbitration about the determinations set forth in the Demand Letter, as it could have under 29

U.S.C. §§ 1399(b) and 1401, respectively. *See id.* ¶¶ 14–16. By letter in January 2023, the Fund notified Gordon Sign of its delinquency on its withdrawal liability and how to cure, *see* ECF 1-2 ("Cure Notice"), yet Gordon Signed failed to cure the deficiency by March 17, 2023, the 60-day deadline, *id.* ¶ 18.

Gordon Sign's failure constitutes a default under 29 U.S.C. § 1399(c)(5)(a).

### B. Damages and Fees Under ERISA

#### 1. Interest and Liquidated Damages

Gordon Sign's § 1399(c)(5) default entitles the Fund to "immediate payment of the outstanding amount of [Gordon Sign's] withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." 29 U.S.C. § 1399(c)(5). In a civil action brought by a multiemployer plan to enforce an employer's obligation to pay withdrawal liability, a court must award a prevailing plaintiff the amount of the withdrawal liability, interest on that amount, and liquidated damages in an amount equal to the greater of the amount of interest or 20% of the withdrawal liability, as well as reasonable attorneys' fees and litigation costs. *See* 29 U.S.C. § 1132(g)(2) (listing amounts the court shall award in a judgment in an action to enforce an employer's obligations to make contributions to a multiemployer plan under 29 U.S.C. § 1145); 29 U.S.C. § 1451(b) (providing that, in an action "to compel an employer to pay withdrawal liability," the employer's failure to pay withdrawal liability "shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)").

The calculation of Gordon Sign's withdrawal liability is detailed in an attachment to the Fund's Demand Letter from November 10, 2022. *See* ECF 1-1. The letter shows a withdrawal-liability amount of $254,497 based upon the rules of the Fund. *See id.*

Plaintiffs calculate the interest owed on the withdrawal liability in a declaration by Michael

O'Malley, the Fund's Audit & Collections Director. *See* ECF 13-6 (the "O'Malley Declaration").

Under the Fund's rules, the interest rate is determined "at the rate of underpayment of federal

income taxes under [Internal Revenue Code §] 6621." ECF 13-5, at 2 (the "Fund Rules"); *see* 29

U.S.C. § 1132(g)(2) (interest "determined by using the rate provided under the plan, or, if none,

the rate prescribed under [26 U.S.C. § 6621]"). But the Fund, through O'Malley or otherwise,

does not provide the interest rates it used to calculate interest due. *See* ECF 13-6 (stating he

calculated the interest due—but not identifying the specific rates he used, merely referring to

"Section 11.24(f) of the Fund's Rules and Regulations"). Instead, Plaintiffs, through the O'Malley

Declaration, point to the Section 11.24(f) of the Fund Rules, which, in turn, points to interest rates

periodically set by the Pension Benefit Guaranty Corporation ("PBGC"). Plaintiffs then attach a

barebones document to the O'Malley Declaration, showing no work. *See* ECF 13-6, at 3. The

Court simply cannot countenance such slipshod calculations of damages.

On its own, the Court referred to the PBGC interest rates for underpayment to calculate the

interest Gordon Sign owes. *See Late Premium Payment Interest Charges*, PBGC (last updated

Nov. 19, 2024), https://www.pbgc.gov/prac/interest/lpp. And the Court's outcome differs from

Plaintiffs'. With a $254,497 payment due on January 10, 2023—not, as O'Malley says, January

1, 2023, *see* ECF 13-6, at 3—the interest Gordon Sign owed on May 1, 2024, was $25,724.55.

See the below chart:

| For Period Starting: | | 1/10/2023 | | 4/1/2023 | | 7/1/2023 | | 10/1/2023 | | 1/1/2024 | | 4/1/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Starting Principle | $ | 254,497.00 | $ | 258,431.34 | $ | 262,930.22 | $ | 267,558.72 | $ | 272,948.21 | $ | 278,385.25 |
| Annual Interest Rate | | 7% | | 7% | | 7% | | 8% | | 8% | | 8% |
| Interest Rate by Day | | 0.0191781% | | 0.0191781% | | 0.0191781% | | 0.0219178% | | 0.0219178% | | 0.0219178% |
| Period Start Date | | 1/10/2023 | | 4/1/2023 | | 7/1/2023 | | 10/1/2023 | | 1/1/2024 | | 4/1/2024 |
| Period End Date | | 3/31/2023 | | 6/30/2023 | | 9/30/2023 | | 12/31/2023 | | 3/31/2024 | | 5/1/2024 |
| Days in Period | | 80 | | 90 | | 91 | | 91 | | 90 | | 30 |
| Interest for Period | $ | 3,934.34 | $ | 4,498.88 | $ | 4,628.50 | $ | 5,389.49 | $ | 5,437.04 | $ | 1,836.31 |
| New Principle | $ | 258,431.34 | $ | 262,930.22 | $ | 267,558.72 | $ | 272,948.21 | $ | 278,385.25 | $ | 280,221.55 |
| | | | | | | | | | | | | |
| TOTAL INTEREST (All Periods) | $ | 25,724.55 | | | | | | | | | | |

The Fund calculated $27,069.07. *See id.* ¶ 7. The interest rates for these calculations come from PBGC,[2] as required by the Fund Rules. ECF 13-5, at § 11.24(f) ("Interest shall accrue on any late payment from the date the payment was due until the date paid in accordance with PBGC regulations.").

Interest has continued to accrue since May 1, 2024, and at current rates, increases by $51.35 each day. As of this writing on February 28, 2025, using the PBGC interest rates[3] and the same calculations above, Gordon Sign now owes $42,751.87 in interest.

Pursuant to 29 U.S.C. § 1132(g)(2)(C), the amount of liquidated damages in this case is determined by the greater amount of the interest on withdrawal liability or 20% of withdrawal liability. Twenty percent of the $254,497 withdrawal liability is, as the Fund claims, $50,899.40, which is greater than the amount of interest currently owed. The Court thus finds that the Fund is entitled to liquidated damages in the amount of $50,899.40.

The default judgment entered in this case will include awards of $254,497.00 in withdrawal liability; $42,751.87 in interest; and $50,899.40 in liquidated damages.

### 2. *Attorneys' Fees and Costs*

The Fund also seeks an award of attorneys' fees and costs, which are available in ERISA cases. 29 U.S.C. § 1132(g)(2). Upon entering judgment in favor of a plaintiff in an ERISA action for a plan to recover unpaid contributions, a court "shall award the plan . . . reasonable attorney's

---

[2] PBGC publishes interest rates quarterly. *See Late Premium Payment Interest Charges*, PBGC (last updated Nov. 19, 2024), https://www.pbgc.gov/prac/interest/lpp. For the first three quarters of 2023, the relevant annual rate was 7%. *Id.* For the remaining quarters through May 2024, the rate was 8%. *Id.* Interest on late payments compounds daily. *Id.*

[3] PBGC maintained an 8% rate for all of 2024. *Id.* For the first quarter of 2025, the annualized interest rate is 7%. *Id.*

fees and costs of the action, to be paid by the defendant." *Id.* In calculating an award of attorneys'

fees, a court must determine the lodestar amount, defined as a "reasonable hourly rate multiplied

by hours reasonably expended." *Grissom v. Mills Corp.*, 549 F.3d 313, 320–21 (4th Cir. 2008).

The Fourth Circuit has held that a court's

> discretion should be guided by the following twelve factors: (1) the time and labor
> expended; (2) the novelty and difficulty of the questions raised; (3) the skill
> required to properly perform the legal services rendered; (4) the attorney's
> opportunity costs in pressing the instant litigation; (5) the customary fee for like
> work; (6) the attorney's expectations at the outset of the litigation; (7) the time
> limitations imposed by the client or circumstances; (8) the amount in controversy
> and the results obtained; (9) the experience, reputation and ability of the attorney;
> (10) the undesirability of the case within the legal community in which the suit
> arose; (11) the nature and length of the professional relationship between attorney
> and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). In addition, Appendix

B to this Court's Local Rules ("Rules and Guidelines for Determining Attorneys' Fees in Certain

Cases") provides that lawyers admitted to the bar for twenty years or more may reasonably bill

$300 to 475 per hour and that lawyers admitted to the bar for less than five years may reasonably

bill $150 to 225. These rates serve as guidelines in determining the reasonableness of hourly rates.

Throughout this litigation, the Fund has been represented by Patrick J. Kukalis of the law

firm Tucker Arensberg, P.C. *See* ECF 1. According to the Motion and its attachments, the Fund

has also been represented by two other lawyers, Ian M. Grecco and Taylor N. Riedel, with the

assistance of a paralegal, Rachel M. Bergman, all from Tucker Arensberg. *See* ECF 13-7, at ¶¶ 10–

13.[4]

---

[4] Neil Joseph Gregorio appeared on the papers but did not bill hours to this litigation. *See* ECF 1.
Paralegal Lori Buckreis appears in the declaration regarding fees but, like Gregorio, did not bill
any hours. *See* ECF 13-7, at ¶ 14.

Kukalis has been a licensed attorney for less than five years. *See id.* ¶ 11. He charged an hourly rate of $205, $215, and $240, in the years 2022, 2023, and 2024, respectively. *Id.* ¶ 15. This rate is mostly within the guidelines set forth in the Local Rules; the Court finds it reasonable. Grecco, when he worked on the case in 2022 and 2023, had been a licensed attorney for between five and eight years. *See id.* ¶ 10. He charged an hourly rate of $245 in 2022 and $260 in 2024. *Id.* ¶ 15. These rates are within the guidelines and are reasonable. Riedel was less than one year out of law school when she billed 3.2 hours to this case. She billed at a rate higher than the guidelines at $230 per hour. That is $80 per hour over the lowest rate recommended by the guidelines. Accordingly, the Court will reduce her rate to $200 per hour. That changes her fees from $736 (3.2 *times* $230) to $640 (3.2 *times* $200). Bergman billed hourly rates of $175, $185, and $200 in the three years at issue. *Id.* ¶ 15. That rate, as Plaintiffs point out, *see id.* ¶ 17, exceeds the guidelines rate for paralegals of $95 to $150 per hour. But an experienced and knowledgeable paralegal can make all the difference, and Bergman has nearly 30 years' experience with "hundreds of ERISA cases" behind her. *Id.* ¶¶ 14–15, 17. Further, as Plaintiffs highlight, "[s]uch experience results in lower fees to the client overall even with the slightly higher rate." As such, the Court will not adjust Bergman's rate.

The Court further finds that the time these attorneys and Bergman spent working on this case, 54.1 hours total, is reasonable. After thoroughly reviewing the submissions in support of attorney's fees and weighing the relevant factors detailed in *Robinson*, the Court will award the Fund attorneys' fees in the amount of $11,474.00.

Finally, the Fund incurred a total of $575.00 in costs, which includes the $405.00 fee for filing the complaint and the cost of serving Defendant. *Id.* ¶ 20. The Court will award the Fund costs in the amount of $575.00.

12

In total, the Court will award to the Fund $360,197.27 in damages against Gordon Sign. This amount comprises $254,497.00 in withdrawal liability; $42,751.87 in interest through February 28, 2025; $50,899.40 in liquidated damages; $11,474.00 in attorneys' fees; and $575.00 in costs.

## IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion will be **GRANTED in part** and **DENIED in part,** only as to the calculation of damages.  A separate order will issue.


Dated: February 28, 2025                                        /s/
                                                    Brendan A. Hurson
                                                    United States District Judge